J-S56031-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: RELINQUISHMENT OF J.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 473 MDA 2016 |

Appeal from the Order Entered February 22, 2016 in
the Court of Common Pleas of Lackawanna County
Orphans' Court at No(s):  A-61, Year 2014

BEFORE:  BENDER, P.J.E., PANELLA, J., STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:               **FILED AUGUST 16, 2016**

Appellant, J.R. ("Mother"), appeals from the order dated February 18, 2016, and entered February 22, 2016, in the Lackawanna County Court of Common Pleas, by the Honorable Margaret Bisignani Moyle, granting the petition of the Lackawanna County Office of Youth and Family Services ("OYFS") and involuntarily terminating her parental rights to her minor, dependent child, J.R. ("Child"), a male born in September of 2005, pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b).[1]  After review, we affirm.

_____

[1] The trial court entered a separate order involuntarily terminating the parental rights of Child's father, P.C. ("Father"), the same day, which Father appeals at a separate appeal, Superior Court Docket Number 474 MDA 2016.

*Former Justice specially assigned to the Superior Court.

The trial court summarized the relevant procedural and factual history, in part, as follows:

> Mother and Father have one biological child, J.R., whose date of birth is [in] September [of] 2005. The child was first placed by the agency in November of 2012, due to an incident wherein he was burned with a hair straightener. Mother was arrested and eventually pled guilty to Endangering the Welfare of a Child as a result of this incident. Mother's case was transferred to Mental Health Treatment Court upon her release from Lackawanna County prison. The child remained in placement until October of 2013 when he was returned to Mother. He had been placed in kinship care with [M]aternal [G]randmother.
>
> . . .
>
> The minor child and his sister were returned to Mother in October of 2013 for a period of three (3) months. During that time, Mother was being supervised in Mental Health Treatment Court. Initially, she was in full compliance with Mental Health Court. However, on January 2, 2014, Mother was asked to produce a urine screen. Mother absconded from the Lackawanna County Courthouse and was on the run for four (4) weeks. The child and his sister were placed on January 2, 2014, in kinship foster care due to Mother's flight.[2] Mother was eventually apprehended and incarcerated on felony drug charges on February 5, 2014. She was arrested and incarcerated on that date for Possession with Intent to Deliver and for a parole violation.

Trial Court Opinion, 4/4/16, at 1-2 (citations to record omitted) (footnotes omitted).

---

[2] Child was initially placed with [M]aternal [G]randmother and then a friend of Mother, but was ultimately removed and placed in traditional foster care due to violation of the established safety plan. N.T., 1/13/16, at 40-41.

Upon her apprehension in February of 2014, Mother was incarcerated in Lackawanna County for approximately one year and then transferred to SCI Cambridge Springs until her release in August 2015. N.T., 1/13/16, at 20, 23, 33, 42; N.T., 1/28/16, at 106, 197-98. Father, who was incarcerated at the time of Child's birth through the time of his placement, was incarcerated in Lackawanna County and then transferred to federal facilities in West Virginia and Kentucky until his release in September 2014. N.T., 1/13/16, at 44, 47, 65; N.T., 2/1/16, at 86-88.

As a result of the above, an emergency order for protective custody was granted on November 16, 2012. OYFS Exhibit C, 1/13/16.[3] The trial court thereafter adjudicated Child dependent on January 7, 2013. *Id.* After Child had been returned to Mother's custody in October 2013, a subsequent emergency protective custody order was entered on January 21, 2014. *Id.*

OYFS filed a petition to terminate parental rights on August 4, 2014. Subsequent to Father's being granted six months to reunify with Child,[4] OYFS proceeded with its petition and all contact between Child and both parents was suspended. *See* Order, filed 12/4/14; N.T., 1/13/16, at 24-26, 29, 36, 66-67; N.T., 1/28/16, at 80. The trial court held termination

---

[3] We note these orders are not provided elsewhere in the certified record.

[4] As noted by OYFS caseworker O'Day, Father was actually given an additional six months beyond the six months he was initially granted. N.T., 1/13/16, at 36.

hearings on January 13, 2016, January 28, 2016, and February 1, 2016.[5] At the termination hearings, OYFS presented the testimony of the following: OYFS caseworker, Sadie O'Day; OYFS case aide, Keiran Loughney; OYFS caseworker, Rebecca Brojack; Families United Network foster care case manager, Helenmae Newcomer; NHS Human Services therapist, Elizabeth Lewis; and foster mother, K.P. Mother testified on her own behalf. Father testified on his own behalf and presented the testimony of his father, Child's paternal grandfather, G.C.

By order dated February 18, 2016, and entered February 22, 2016, the trial court involuntarily terminated the parental rights of Mother. On March 16, 2016, Mother, through counsel, filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Mother raises the following issues for review:

[1.] Whether the [t]rial [c]ourt erred as a matter of law and/or manifestly abused its discretion in determining [OYFS] sustained its burden of proving the termination of M[other]'s parental rights is warranted under 2511(a)(2) of the Adoption Act?

[2.] Even if this Court concludes [OYFS] established statutory grounds for the termination of M[other]'s parental rights, whether the [trial court] nevertheless erred as a matter of law and/or manifestly abused its discretion in determining [OYFS]

---

[5] While the hearing was originally scheduled for December 4, 2014, in addition to Father's six-month reunification period, numerous continuances further delayed this matter. N.T., 1/13/16, at 35-36, 63; Order, filed 12/23/15; Order, filed 11/9/15; Order, filed 10/15/15; Order, filed 8/12/15.

sustained its additional burden of proving the termination of M[other]'s parental rights is in the best interest of the [child]?

Mother's Brief, at 5.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, 9 A.3d [1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa. Super. 2003) (citation omitted).

The termination of parental rights is guided by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated

analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M. II*, 708 A.2d 88, 91 (Pa. 1998)).

In this case, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), and (8), as well as (b).[6]

---

[6] While the trial court's order does not specify the subsections under which it terminated Mother's parental rights, in its opinion the trial court notes that "[OYFS] has satisfied its burden of proof by establishing, by clear and convincing evidence, Mother's parental rights should be terminated pursuant to **each subsection of [23 Pa.C.S. § 2511(a)] alleged**." Trial Court
*(Footnote Continued Next Page)*

We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of section 2511(a), as well as section 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc)*. Here, we analyze the court's termination pursuant to sections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ***
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not

*(Footnote Continued)* _____

Opinion, 4/4/16, at 15 (emphasis added). OYFS sought termination pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), and (8). Petition for Involuntary Termination, 8/4/14. We note the trial court only conducts an analysis of subsection (a)(2), stating, "[P]roof by clear and convincing evidence pursuant to one of the subsections alleged satisfies the first prong of 23 Pa.C.S.A. § 2511(a). Therefore, this Court will not address the other subsections." Trial Court Opinion, 4/4/16, at 17 n.6.

consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first examine the court's termination of Mother's parental rights under section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.A § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015) (quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002)).

In *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012), our Supreme Court, in addressing Section 2511(a)(2), held that "incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the

causes of the incapacity cannot or will not be remedied." *Id.* at 828. **See also In re D.C.D.**, 105 A.3d 662, 675 (Pa. 2014) (holding that the father's incarceration prior to the child's birth and until the child is at least age seven renders family reunification an unrealistic goal. As such, the court was within its discretion to terminate parental rights "notwithstanding the agency's failure" to follow the court's initial directive that reunification efforts be made).

In finding evidence establishing grounds under Section 2511(a)(2), the trial court noted Mother's absence from Child's life and poor decisions affecting Child. Trial Court Opinion, 4/4/16, at 15-17. The court stated:

> Mother has only had two visits with her child in more than two years. She has been absent from his life due to her incarceration in both Lackawanna County and state prison. Mother has also shown a pattern of poor decision making when it comes to raising [Child]. [Child] and his sister were initially placed due to a burn, which resulted in Mother's arrest and conviction. At the time of [Child] and his sister's second placement, due to [M]other's flight, they were placed with [M]aternal [G]randmother. Because Mother was on the run, a safety plan was implemented, prohibiting [M]aternal [G]randmother from allowing contact between Mother and the children. It was discovered Mother and [M]aternal [G]randmother violated the safety plan, necessitating a change in placement. The children were then placed with Mother's friend, [S.P.]. Once again, a safety plan was implemented. Ms. [P.] was prohibited from allowing contact between Mother and the children. Again, the plan was violated necessitating the children be placed in traditional foster care.
>
> When Mother absconded from the courthouse on January 2, 2014, she left [Child] and his sister behind without parental supervision. She was ultimately located on February 5, 2014. At which time, she was arrested. . . . Initially, Mother was unable to visit with [Child] because she was in solitary

- 9 -

confinement. She was then prohibited from having contact in state prison because [Child] was a victim. Mother's interaction with [Child] has been limited to a handful of phone calls and two visits within the last two years. All of the above facts are evidence of Mother's "repeated and continued incapacity, abuse, neglect or refusal of the parent" as set forth in Pa.C.S.A. section 2511(a)(2), has caused [Child] to be "without essential parental care, control, or subsistence necessary for his physical and emotional well-being." Clearly, "the conditions and causes of the incapacity, abuse and neglect or refusal cannot or will not be remedied by Mother.

*Id.*

Mother, however, argues that by the time the hearings took place she "had complied with the components of the permanency plan and that a finding of minimal or no compliance and progress was incorrect." Mother's Brief, at 10. Moreover, Mother asserts that the conditions and causes of Child's placement "were in fact remedied at the time of hearing." *Id.*

A review of the record supports the trial court's finding of grounds for termination under section 2511(a)(2). Mother was incarcerated following the November 2012 incident where Child was burned, and again from February 2014 until August 2015. N.T., 1/13/16, at 20, 23, 33, 38, 42; N.T., 1/28/16, at 106. While Mother maintained contact with Child, Mother had only two visits with Child since her incarceration and Child's placement in early 2014. N.T., 1/13/16, at 22-23, 31-32, 34, 59-60, 62, 64; N.T., 1/28/16, at 154-55, 161; Mother's Exhibit No.1, 1/28/16. Moreover, Mother had not seen Child in almost two years. N.T., 1/13/16, at 23, 31-32. Mother was initially placed in solitary confinement and unable to have visitors for almost one year while incarcerated in Lackawanna County, and

then was unable to have Child as a visitor, as he was considered a victim, once transferred to SCI Cambridge Springs. N.T., 1/13/16, at 23-24; N.T., 1/28/16, at 197-98. On this topic, OYFS caseworker Sadie O'Day testified:

> I mean when she was incarcerated in the county for the year that she was incarcerated there, I visited her several times and we talked about her behavior that was leading her to being in solitary confinement. And in that year she didn't correct the behavior to where she was able to be released from solitary confinement and visit with the children. She did request visits when she was in state prison. As I said before, those visits weren't able to happen.

N.T., 1/13/16, at 58.

Ms. O'Day also indicated concerns related to Mother based on Mother's behavior and essential lack of visitation. *Id.* at 34. Ms. O'Day stated:

> The concerns for [Mother] is the pattern of ongoing behaviors that have prevented [Child] from having stability in his life and the decisions that she has made that were not in the best interest of [Child] that had put him in danger and resulted in him being placed into foster care.
>
> [OYFS] is still concerned with – they've only had two visits in the last three years or two years that he has been in placement this time. The bond that [Child] has with his mother at this point, the trust that he has for her, and his mental health he is involved with counseling. [sic] He's on medication as well. He has a lot of things that he's working through to understand some of the trauma and loss that he's had in his life up until this point.

*Id.*

Additionally, Ms. O'Day noted that Mother did not complete the goals established for her. *Id.* at 20-22, 32-34, 37. Mother's compliance was assessed as "minimal" and progress as "none."[7] *Id.* at 37. Specifically, Ms. O'Day testified that she did not have documentation as to Mother's continued mental health treatment and, although Mother did start the diagnostic assessment and/or parenting assessment evaluation, she did not do so until three weeks prior, despite the availability and ability to enroll earlier. *Id.* at 21-22, 56-57. Hence, the record substantiates the conclusion that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for his physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Mother cannot or will not remedy this situation. *See id.*

We next determine whether termination was proper under section 2511(b). With regard to section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781,

---

[7] Ms. O'Day clarified that, in making this determination, she was looking to when the petition for termination was filed and not considering that which was completed subsequent. N.T., 1/13/16, at 62-63.

- 12 -

791 (Pa. Super. 2012). In *In re E.M.*, 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "[I]n cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (citations omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted).

As further recognized in *T.S.M.*:

[C]ontradictory considerations exist as to whether termination will benefit the needs and welfare of a child who has a strong but unhealthy bond to his biological parent, especially considering the existence or lack thereof of bonds to a pre-adoptive family. As with dependency determinations, we emphasize that the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. *See, e.g., R.J.T.,* 9 A.3d at 1190 (holding that statutory criteria of whether child has been in care for fifteen of the prior twenty-two months should not be viewed as a "litmus test" but rather as merely one of many factors in considering goal change). Obviously, attention must be paid to the pain that inevitably

- 13 -

results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. Similarly, while termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home, termination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home.

71 A.3d at 268-69.

In examining Section 2511(b), the trial court stated:

The testimony established [Child] and his sister C.R. have resided together in their current foster home since March 24, 2014. In the foster home all of his emotional, physical, and developmental needs are being met. He has had twice weekly home based therapy with Ms. Lewis throughout his placement. Ms. Lewis actually had a relationship with him because she was also his sister's therapist. Since his first placement in November 2012, [Child] has only been in his mother's care for three (3) months out of three and one-half (3 ½) years. As of this date, [Child] has been in placement for a total of thirty-six (36) months, over two separate placements.

[Child], as evidenced by testimony, is in desperate need for permanency. All of the emotional turmoil and uncertainty surrounding his initial placement, reunification, and replacement in three (3) separate foster homes due to repeated safety plan violations, and the missed phone calls, have all contributed to [Child]'s emotional distress. The Honorable Chester Harhut suspended all contact between [Child] and his parents in October 2015. Since that time there has been no contact at all. As such, it is in the best interest of [Child] for the parental rights of Mother to be terminated.

Trial Court Opinion, 4/4/16, at 17-18.

Mother argues OYFS failed to establish that the best interests of Child would be served by terminating her rights. Mother's Brief, at 12. In so

claiming, Mother points to the continued bond between herself and Child, as well as the continued contact between herself and Child. *Id.* Mother adds:

> The record presented for review demonstrates through the testimony of the caseworker, the close bond between [Child] and [Mother] before the dependency. And that the contact between Mother and [Child] after that time has been good. As previously noted, Mother has testified of her continual contact with [Child] through letters, and this was confirmed by the caseworker. Mother further testified of the continuing strong bond with [Child] and her desire to have him returned to her. The trial court does not address this bond in its evaluation.

*Id.* (citations to record omitted).

Here, the record likewise corroborates the trial court's termination order pursuant to section 2511(b). Since Mother's incarceration upon apprehension in February 2014, she has had only two visits with Child, which occurred after her release in August 2015. N.T., 1/13/16, at 22-23, 31-32, 34, 59-60, 64. In September 2015, the court discontinued contact between Mother and Child, allowing for one more visit and telephone call. N.T., 1/13/16, at 24-26, 29; N.T., 1/28/16, at 80. As a result, OYFS caseworker Sadie O'Day confirmed that, while there was a strong bond between Mother and Child, it had been "hindered at this point due to the limited contact that they've had with each other." *Id.* She further elaborated,

> I think that he still recognizes his mother as his mother. I think that he loves his mother. I think that he lacks trust and understanding for the situation that he's in. I can't say for certain there is a bond between them, not that there can't ever be a bond between them. But at this point, they've had only two visits in the last two years. They've had phone contact. But it would be difficult for me to say that there is a bond between them with such limited contact.

- 15 -

*Id.* As to Mother, and the relationship between Mother and Child, Ms. O'Day also testified as follows:

> [Mother] and [Child] had a strong bond when they lived together. When [Child] came back into our custody after mom was arrested, there was a lack of communication between him and his mother due to the solitary confinement and then her being in state prison and not being allowed to visit. During that time, there was anger on [Child]'s part in regards to his mother and not understanding why he was back in foster care and couldn't be back with his family.
>
> [Child] has struggled with understanding why these things have happened to him and why he had to be in foster care. He is working through those things with his family home based therapist and all the other services he has. At this point, he still struggles. He has a lot of anger. And I think from my conversations with the foster parents him [sic] not really understanding kind of being stuck in the middle without permanency or knowing what exactly is going to happen to him at the end of this.

*Id.* at 34-35. In turn, Child's therapist, Elizabeth Lewis, who indicated that she discussed the termination petition with Child, stated that Child then inquired as to continued visitation and/or contact with Maternal Grandmother, not Mother or Father. N.T., 1/28/16, at 114.

Finally, and significantly, foster care case manager Helenmae Newcomer confirmed a bond between Child and foster parents from her observation of their interactions and relationship. N.T., 1/28/16, at 97. Likewise, caseworker O'Day testified Child was doing "well" in the foster care

placement where he has been for two years.[8]  N.T., 1/13/16, at 18.  Thus, as confirmed by the record, the emotional needs and welfare of Child favor termination.  Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Mother's parental rights under 23 Pa.C.S.A. §§ 2511(a)(2) and (b).

Based on the foregoing analysis of the trial court's termination of Mother's parental rights, we affirm the order of the trial court.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/16/2016

---

[8] Notably, Child's sister, C.R., is currently placed with him.  N.T., 1/13/16, at 100-01; N.T., 2/1/16, at 10-11.